**KAYE, ROSE & PARTNERS, LLP**
Bradley M. Rose, Esq. (126281)
brose@kayerose.com
169 South Rodeo Drive
Beverly Hills, California  90212
Telephone: (310) 551-6555
Facsimile: (310) 277-1220

*Attorneys for Defendant*
**Capital Ship Management Corp.**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CAPITAL SHIP MANAGEMENT CORP., AND IOAN LUCA,<br><br>Defendants. | **19-CR-354-VAP**<br><br>**MOTION TO DISMISS COUNTS ONE, TWO, THREE, AND FIVE OF THE INDICTMENT**<br><br>Date:        September 9, 2019<br>Time:       9:00 a.m.<br>Judge:      Virginia A. Phillips |

**COME NOW**, Capital Ship Management Corp. ("CSM") and Ioan Luca ("Luca") (collectively "Defendants"), by and through undersigned counsel, and submit this Joint Motion to Dismiss Counts One through Three and Five of the Indictment for failure to state an offense and/or for lack of jurisdiction.  In support thereof, Defendants state as follows:

<u>**PRELIMINARY STATEMENT**</u>

This Court should not countenance and should reject the repeated attempts by the United States to ignore a comprehensive international enforcement regime predicated on cooperation by member nations, and replace it with the government's own self-serving interpretation of the statutes and regulations, in an attempt to exercise extra-territorial jurisdiction and control over all vessels in the world.  Although the Indictment charges five (5) purported violations of U.S. crimes, all charges indisputably stem from alleged conduct and events which occurred on the high seas, <u>beyond the jurisdiction of the United States</u>. *See* Doc.

Kaye, Rose & Partners LLP

41.   Notwithstanding, the government continues to improperly expand the boundaries of alleged foreign national and foreign corporate vicarious criminal liability for events with only the thinnest connection to the United States.  There is no dispute that the United States has become well-known throughout the world for being disproportionately heavy-handed in targeting foreign operators of foreign-flagged vessels and for detaining foreign crew members as collateral for events occurring *outside* the jurisdiction of the United States pursuant to the purported authority granted under 33 U.S.C. § 1908(e).  No other country in the world exercises the same punitive and regressive enforcement regime for the alleged conduct which is alleged to have occurred onboard the M/V CMA CGM AMAZON, *i.e.* causing the knowing failure to maintain an accurate Oil Record Book while in U.S. waters (and associated charges). The present criminal prosecution is ill-advised, ill-conceived, and legally unsustainable.

## STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

On June 13, 2019, Defendant Luca individually, and  CSM (the "Organizational Defendant") vicariously, were indicted on charges of causing the knowing Failure to Maintain an Accurate Oil Record Book, in violation of 33 U.S.C. §1908(a) and 18 U.S.C. §2 (Count Two); Obstruction of Justice, in violation of 18 U.S.C. § §1519 and 18 U.S.C. §2  (Count Three); Conspiracy, in violation of 18 U.S.C. § 371 (Count One – where the object of the alleged conspiracy was to willfully cause the failure to maintain an accurate Oil Record Book and to obstruct the investigation thereof); Witness Tampering, in violation of 18 U.S.C. § 1512(b)(3) (Count Four); and Obstruction of the Due Administration of Justice, in  violation of 18 U.S.C. § 1503 (Count Five). *See* Doc. 41.  On June 24, 2019, each defendant entered pleas of not guilty to all five (5) charges.  *See* Doc. 65, 69.

The M/V CMA CGM AMAZON ("the Vessel") is a 96,424 gross-ton, ocean-going containership.  CSM, pursuant to a ship management contract, operates the Vessel under the supervision of the Liberian Registry (the "Flag State Administration" or "Flag State").[1]  It is

---

[1] The Flag State of a commercial vessel is the sovereignty under whose laws the vessel is registered or licensed and is tasked with certifying a ship's compliance with international standards. *See*, *e.g.*, *United States v. Abrogar*, 459 F.3d 430, 432 (3d Cir. 2006).

2

Kaye, Rose & Partners LLP

well established U.S. law that Flag States have exclusive jurisdiction over their vessels on the high seas. *See United States v. Vilches-Navarrette*, 413 F. Supp. 2d 60, 70 (D.P.R. Jan 27, 2006) ("it is a fundamental rule of maritime law that ships shall sail under the flag of one State only and, save in exceptional cases…shall be subject to its *exclusive jurisdiction* on the high seas.") (citations omitted); *see also United States v. Hensel*, 699 F.2d 18, 27-28, 1984 AMC 1907 (1st Cir. 1983); UNCLOS, Part XII, Art. 211(2), 217.

Equally important, the Flag Administration, pursuant to the International Convention for the Safety of Life at Sea, is responsible for issuing the Document of Compliance, which certifies that the Safety Management System of a "Company"[2] has been audited and that it complies with the requirements of the International Management Code for the Safe Operation of Ships and for Pollution Prevention ("ISM Code"). The Flag State Administration requires and performs systematic audits to verify compliance with ISM requirements. If a vessel is non-compliant, the Document of Compliance will be withdrawn, and the vessel is prohibited from trading.[3]

The M/V CMA CGM AMAZON arrived in the Port of Los Angeles on or about January 10, 2019. The U.S. Coast Guard inspected the Vessel the next day (and over the ensuing days), including the Vessel's pollution control equipment. Under international marine pollution guidelines ("MARPOL"), the international convention designed to eliminate pollution from ships, and the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. §1901,

---

[2] *"Company"* means the Owner of the ship or any other organization or person such as the Manager, or the Bareboat Charterer, who has assumed the responsibility for operation of the ship from the Shipowner and who on assuming such responsibility has agreed to take over all the duties and responsibility imposed by the Code. *See, e.g.* IMO, *supra*.

[3] The U.S. Coast Guard requires "a valid Document of Compliance certificate if you are the responsible person who, or company which, owns a U.S. vessel engaged on foreign voyages, carrying more than 12 passengers, or is a tanker, bulk freight vessel, freight vessel, or a self-propelled mobile offshore drilling unit of 500 gross tons or more." 33 C.F.R. § 96.330. The Document of Compliance ensures that the responsible party has completed a valid safety management audit, that the vessel is certified, and that the vessel operates in accordance with the approved Safety Management System. *Id.*

Kaye, Rose & Partners LLP

*et seq.* (the U.S. law implementing MARPOL), a port state inspection of the pollution control equipment is properly limited to determining whether the vessel has a valid International Oil Pollution Prevention ("IOPP") certificate, issued by its Flag Administration, in this case Liberia.  The only exception available to this protocol is if, from an inspection or pre-existing information, there is reason to believe that the Vessel does not have the equipment specified in its certificate or has been polluting in the territorial waters of the port state.  The U.S. Coast Guard went far beyond the bounds permitted by MARPOL and APPS in this case. There were (and are) no such allegations in this matter.

## I.   APPLICABLE LAW AND THE LIMITED JURISDICTION OF THE UNITED STATES

### A.  MARPOL 73/78

The International Convention for the Prevention of Pollution from Ships, 1973, as modified by the Protocol of 1978, sets forth international standards for, *inter alia*, regulating discharges from ocean going vessels while in signatory states' territorial waters.  Together, these two (2) treaties are generally referred to as "MARPOL 73/78" or "MARPOL." MARPOL prescribes regulations aimed at preventing and minimizing pollution from ships – both accidental pollution and from routine operations. MARPOL includes detailed provisions relating to the cooperation of signatory states and enforcement of MARPOL's provisions as vessels call from port state to port state.  The treaty is not self-executing, so each signatory state must enact local laws and regulations to give MARPOL effect.  Notwithstanding, the Port State's role in enforcing MARPOL is limited and must be consistent with the historic principles of the law of the sea and to preserve the critical role of the government under whose authority the ship is registered and operates *i.e.* – a vessel's Flag State Administration.

### 1.   The Role of the Flag State Administration

MARPOL makes clear that its requirements will be enforced by the "Administration" and defines "Administration" for each ship as "the Government of the State under whose authority the ship is operating."  MARPOL 73/78, Article 2(5), 12 I.L.M at 1321.  Violations of MARPOL are subject to the jurisdiction and law of the Flag State wherever the violation

Kaye, Rose & Partners LLP

occurs, in this case Liberia. *Id*. at 1322.  Article 6 of MARPOL sets forth the procedures for suspected violations occurring on the high seas.  Signatories are to cooperate in the detection of such violations (MARPOL, Article 6(1)), and to report any such suspected violation by a foreign ship occurring outside the port state party's territorial jurisdiction "to the Administration (*i.e.* the Flag State) so that appropriate action may be taken (by the Flag State) under [MARPOL]."[4]  MARPOL, Art. 6, 12 I.L.M.  Because MARPOL was designed to preserve proper deference to international law and the Flag State Administration, the treaty

---

[4] Relevant provisions are found in sections two (2) through five (5), of MARPOL, which provides as follows:

(2) A ship to which the present Convention applies may, in any port or off-shore terminal of a Party, be subject to inspection by officers appointed or authorized by that Party for the purpose of verifying whether the ship has discharged any harmful substances in violation of the provisions of the Regulations. *If an inspection indicates a violation of the Convention, a report shall be forwarded to the Administration for any appropriate action.*

(3) *Any Party shall furnish to the Administration evidence, if any, that the ship has discharged harmful substances* or effluents containing such substances in violation of the provisions of the Regulations. If it is practicable to do so, the competent authority of the former Party shall notify the master of the ship of the alleged violation.

(4) *Upon receiving such evidence, the Administration so informed shall investigate* the matter, and may request the other Party to furnish further or better evidence of the alleged contravention. If *the Administration* is satisfied that sufficient evidence is available to enable proceedings to be brought in respect of the alleged violation, it *shall cause such proceedings to be taken in accordance with its law* as soon as possible. The *Administration shall promptly inform the Party which has reported the alleged violation, as well as the Organization, of the action taken*.

(5) A Party may also inspect a ship to which the present Convention applies when it enters the ports or off-shore terminals under its jurisdiction, if a request for an investigation is received from any Party together with sufficient evidence that the ship has discharged harmful substances or effluents containing such substances in any place. The report of such investigation shall be sent to the Party requesting it and to the Administration so that the appropriate action may be taken under the present Convention.

MARPOL, Art. 6, 12 I.L.M. at 1323-24 (emphasis added).

Kaye, Rose & Partners LLP

expressly provides that "***all possible efforts*** shall be made ***to avoid a ship being unduly detained or delayed*** under Articles 4, 5 or 6 of the present Convention," and that any ship that is so "unduly detained or delayed…shall be entitled to compensation for any loss or damage suffered." MARPOL, Article 7(2) and (1), 12 I.L.M. at 1312. (emphasis added).

The fundamental principle that the Flag State has exclusive jurisdiction with respect to the conduct of vessels on the high seas, although integral to MARPOL, did not originate with MARPOL.[5] Rather, under long standing traditional international law, the Flag State has plenary enforcement jurisdiction over offenses committed on board the vessel, regardless of where such offenses may occur. This principle is well-recognized by the Supreme Court of the United States. For example, in *Lauritzen v. Lauren*, 345 U.S. 571, 73 S. Ct. 921, 97 L. Ed. 1254 (1953), the Supreme Court stated:

> Law of the Flag. – Perhaps the most venerable and universal rule of maritime law…is that which gives cardinal importance to the flag…<u>This Court has said that the law of the flag supersedes the territorial principle, even for purposes of criminal jurisdiction of personnel of a merchant ship, because [the ship] 'is deemed to be a part of the territory of the sovereignty [whose flag it flies], and not to lose that character when in navigable waters within the territorial limits of another sovereignty.'</u>

*Id.* at 584-85 (emphasis added) (quoting *United States v. Flores*, 289 U.S. 137, 155-59, 53 S. Ct. 580, 77 L. Ed. 1086 (1933)). Dating back to the time of Chief Justice John Marshall, the Supreme Court held that "an act of Congress ought ***never*** to be construed to violate the law of nations, if any other possible construction remains . . . ." *Murray v. The Charming Betsy*, 6 U.S. (2 Cranch) 64, 118, 2 L. Ed. 208 (1804) (emphasis added). Simply put, U.S. laws and regulations are limited in their application to the M/V CMA CGM AMAZON and her crew of foreign nationals. The government overstepped its Port State authority in this matter by conducting an investigation that was not warranted and not referring suspected violation(s) following that inspection/investigation to the Vessel's Flag State Administration, Liberia.

---

[5] MARPOL expressly provides nothing in "[it] shall prejudice…the present or future claims and legal views of any State concerning the law of the sea and the nature and extent of coastal and *flag state jurisdiction*" and that the "term 'jurisdiction' in the present Convention shall be construed in light of international law in force at time of application or interpretation of the present Convention." *See* MARPOL, Art/ 9, 12 I.L.M. at 1326 (emphasis added).

**DEFENDANTS' MOTION TO DISMISS COUNTS ONE, TWO, THREE, AND FIVE OF THE INDICTMENT**

Kaye, Rose & Partners LLP

Kaye, Rose & Partners LLP

1

### 2.   The Role of the Port State

Port States[6] are authorized and required to prohibit violations of MARPOL that occur "**within the jurisdiction of [that] Party**." MARPOL, art. 4(2), 12 I.L.M. at 1322 (emphasis added). In such a case, the Port State may either cause proceedings to be taken in accordance with its laws or refer the matter to the Flag State Administration. *Id.* "MARPOL is not a self-executing treaty; instead, each party agrees to 'give effect' to it." *United States v. Ionia Mgmt. S.A.*, 555 F.3d 303, 307 (2d Cir. 2009) (citing MARPOL, art. 1(1), 1340 U.N.T.S. at 63, 184); *United States v. Abrogar*, 459 F.3d 430, 434 ("Congress did not make every violation of MARPOL by every person a crime under U.S. law.").[7] As such, the United States was required (and did) enact legislation or take other action to make the provisions of MARPOL enforceable as a Port State. *See Medellín v. Texas*, 552 U.S. 491, 128 S. Ct 1346, 170 L. Ed. 2d 190 (2008).

//

//

//

//

---

[6] When a vessel enters the territorial waters or port of a country, that nation is referred to as the "Port State." MARPOL 73/78, Art. 4(2), 12 I.L.M. at 1322.

[7] Significantly, during the 1973 Convention, "the United States strongly urged a provision whereby Port States would have been authorized to prosecute with respect to foreign ships in their ports for violations committed on the high seas," but "this concept was ***rejected***" by the Convention. *1973 IMCO Conference on Marine Pollution from Ships: Hearing Before S. Comm. on Commerce, 93d Cong. 7 (1973)* (statement of Russell E. Train, Administrator, E.P.A.)(available                                                                    at http://babel.hathitrust.org/cgi/pt?id=mdp.39015076083230;view=1up;seq=10) (emphasis added) [hereinafter Hearing on 1973 Convention]. As a result, the United States originally understood the MARPOL Protocol to mean that, "if a ship of another country commits a violation which [the United States] know[s] about *on the high seas and enters our jurisdiction*, [the United States] as port State, but non-flag State, *cannot prosecute that vessel* for the violation outside of our jurisdiction," but must "report it to the flag State." *Id.* at 7 (emphasis added). Thus, the government's prosecution theory—that it may prosecute the Defendants upon "enter[ing]" the jurisdiction of the United States for alleged misconduct that occurred at "sea" --was rejected at the 1973 Convention. The instant Indictment is, therefore, completely contrary to the United States' original understanding and agreement of the MARPOL Protocol.

Kaye, Rose & Partners LLP

### B.  THE ACT TO PREVENT POLLUTION FROM SHIPS (APPS)

To implement the substance of MARPOL as domestic law in the United States, Congress enacted the APPS, 33 U.S.C. §§ 1901-1915. Section 1902 provides that APPS and any regulation promulgated pursuant to it shall apply to the following:

> (1) to a ship of United States registry or nationality, or one operated under the authority of the United States, wherever located; and
>
> (2) with respect to Annexes I[8] and II of the Convention, to a ship, other than a ship referred to in paragraph (1), ***while in the navigable waters of the United States***...

33 U.S.C. § 1902(a) (emphasis added). Congress clearly and unambiguously limited 33 U.S.C.§ 1908(a)'s criminalization of MARPOL violations through United States law and Coast Guard regulations to: (1) U.S. ships, wherever located, and (2) as relevant to this motion to dismiss, to violations occurring on foreign ships *only* while in "the navigable waters of the United States." *Id.*[9]

### C.  UNITED STATES CODE OF FEDERAL REGULATIONS

APPS authorized the U.S. Coast Guard to "prescribe any necessary or desired regulations to carry out the provisions of . . . MARPOL." 33 U.S.C. § 1903(c)(1).  Consistent with MARPOL Annex I, Reg. 17(4), the U.S. regulation found at 33 C.F.R. § 151.25(a) requires that a foreign-flagged vessel (other than an oil tanker) over 400 gross tons, such as the *M/V CMA CGM AMAZON*, "shall maintain an Oil Record Book Part I (Machinery Space Operations)."  *Id.*  The U.S. regulations only apply while the vessel is "**in the navigable**

---

[8] MARPOL Annex I, Reg. 17 is the record keeping requirement for the maintenance of an Oil Record Book and makes it clear that the regulation applies to *inter alia*, "Every oil tanker of 150 gross tonnage and above and every ship of 400 gross tonnage and above other than an oil tanker shall be provided with an Oil Record Book Part I (Machinery space operations)." *See* Annex I, Reg. 17(1).

[9] The Flag State Administration, Liberia, retains exclusive jurisdiction to prosecute any MARPOL violation by the vessel (or its crew) while in international waters. It is well established that the United States' jurisdiction over offenses is generally limited to the territory of the United States, its flagged vessels and/or conduct by its citizens. *Abrogar*, 459 F.3d 430, 436 (3d Cir. 2006); *United States v. Smiley*, 27 F. Cas. 1132 (C.C.N.D. Cal. Sept. 5, 1864).

**waters of the United States, or while at a port or terminal under the jurisdiction of the United States**." 33 C.F.R. § 151.09(a)(5) (emphasis added). The Coast Guard regulations go on to identify the specific types of transfers which require entries to be made into the Oil Record Book (while in U.S. waters).  *See* 33 U.S.C. § 151.25(d). The regulations continue at subsection (j) and specifically provide that "[t]he master or other person having charge of a ship required to keep an Oil Record Book shall be responsible for the maintenance of such record." 33 U.S.C. § 151.25(j); *see also United States v. Fafalios*, 817 F.3d 155, 159 (5th Cir. 2016). This record keeping obligation is further limited by § 151.09(a)(5), which makes clear that, as a matter of U.S. law, the obligation only applies while in U.S. waters or at a port or terminal of the United States. *Id.*

### D.  THE UNITED STATES LACKS JURISDICTION

The limitations on the United States' jurisdiction in these types of cases were clearly and unambiguously explained by the Third Circuit Court of Appeals in *United States v. Abrogar*:

> [U]nder the APPS and accompanying regulations, Congress and the Coast Guard created criminal liability for foreign vessels and personnel **only for those substantive violations of MARPOL that occur in U.S. ports or waters**. Stated differently, a MARPOL violation by such a vessel or its personnel is only an "offense" under U.S. law if that violation occurs within the boundaries of U.S. waters or within a U.S. port . . . **[N]o provision of the APPS or its accompanying regulations indicates that "failure to maintain an accurate oil record book" by a foreign ship outside U.S. waters is a crime**. Stated differently, the terms of the Act and its regulations exclude from criminal liability the "failure to maintain an accurate oil record book" by foreign vessels outside U.S. waters.

*Abrogar*, 459 F.3d at 435 (emphasis added); *see also United States v. Jho*, 534 F.3d 398, 404 (5th. Cir. 2008) (emphasis added).

The present case presents an issue of first impression in this Circuit,[10] *to wit* -- whether the Indictment impermissibly attempts to include an element in Count Two, *i.e.* the knowing failure to "maintain an accurate Oil Record Book," by a Chief Engineer for conduct which

---

[10] Similar challenges are currently pending in two (2) cases in the District of Delaware, but have not yet been decided.

Kaye, Rose & Partners LLP

occurred outside of U.S. waters and jurisdiction (to the extent it occurred at all). Congress clearly intended (and did) carefully define and limit the criminal prosecutions of alleged violations of MARPOL, as do the Coast Guard regulations implementing APPS; all of which acknowledge MARPOL's deference to international law and the Flag Administrations.  *See* MARPOL '73, Art. 7, 12 I.L.M. at 1312.

## II.  ARGUMENT

### A.  RULE 12 STANDARD OF REVIEW

Rule 12 of the Federal Rules of Criminal Procedure requires that defendants bring all motions to dismiss defective indictments before trial. *See* Fed. R. Crim. P. 12(b)(3)(B). Challenges to the court's jurisdiction, including claims that the Court lacks subject matter jurisdiction pursuant to Fed. R. Crim P. 12(b)(2), may be brought at any time. *Id*.  Both defects are present under the Indictment at issue here, (1) the failure to state an offense, Fed. R. Crim. P. 12(b)(3)(B)(v); and (2) lack of jurisdiction, Fed. R. Crim. P. 12(b)(2), and warrant relief from this Court and the dismissal of at least Counts One, Two, Three, and Five of the Indictment.

Under Rule 12(b)(3)(B), the District Court may hear a motion alleging a defect in the indictment and a claim that the indictment fails to state an offense.  *See* Fed. R. Crim. P. 12(b)(3)(B) ("The following must be raised before trial: . . . a motion alleging a defect in the indictment . . . but at any time while the case is pending, the court may hear a claim that the indictment . . . fails . . . to state an offense.").  Rule 12(b) allows the consideration at the pretrial stage of any defense "without a trial on the merits." Fed. R. Crim. P. 12(b)(1).  To be legally sufficient, an Indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]" Fed . R. Crim. P. 7(c)(1));  *United States v. Milovanovic*, 678 F.3d 713, 717 (9th Cir. 2012) (the Court must determine if whether on the facts alleged in the Indictment an actual crime has been alleged.

In order for an Indictment to be valid, it must state the elements of the offense and "sufficiently apprise[] the defendant of what he must be prepared to meet." *Russell v. United*

*States*, 369 U.S. 749, 763, 82 S. Ct. 1038, 8 L. Ed. 2d 240 (1962); *see also United States v. Ngige*, 780 F.3d 497, 502 (1st Cir. 2015). To withstand a motion to dismiss, an indictment must allege that the defendant performed acts that, if proven, would constitute a violation of the law under which the defendant has been charged. *See U.S. v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986); *United States v. Higareda-Ramirez*, 107 F. Supp. 2d 1248, 1251 (D. Haw. July 26, 2000); *United States v. Coia*, 719 F.2d 1120, 1123 (11th Cir. 1983) (stating that "[i]t is . . . mandated, that the district court dismiss an indictment if the indictment fails to allege facts which constitute a prosecutable offense.") *reh'g denied*, 724 F.2d 978, *cert. denied*, 466 U.S. 973, 104 S.Ct. 2349, 80 L.Ed. 2d 822 (1984).   An indictment fails to state the elements of the offense if the facts alleged "fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *United States v. Bergrin,* 650 F.3d 257, 264-65 (3d Cir. 2011).[11]

An Indictment must also be dismissed where the court lacks subject matter jurisdiction because it does not relate to an "offense against the laws of the United States." 18 U.S.C. § 3231; *see also United States v. Cogswell*, 637 F. Supp. 295, 296 (N.D. Cal. Nov. 19, 1985); *United States v. Schulman*, 817 F.2d 1355, 1358 (9th Cir. 1987) (a pretrial motion to dismiss is appropriate when (as here), it involves questions of law rather than fact).

**B.  COUNT TWO OF THE INDICTMENT MUST BE DISMISSED[12]**

A district court is "required to dismiss [any count of an] indictment [that] fails to allege facts that constitute a prosecutable offense." *United States v. Cure*, 804 F.2d 625, 627 (11th

---

[11] Criminal laws are to be strictly construed, *United States v. Enmons*, 410 U.S. 396, 411, 35 L. Ed. 2d 379, 93 S. Ct. 1007 (1973) and the Constitution mandates fair notice. U.S. Const. amend. V; *Kolender v. Lawson*, 461 U.S. 352, 357, 75 L. Ed. 2d 903, 103 S. Ct. 1855 (1983) ("[A] penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.").

[12] Count One charges Defendants (and others) with Conspiracy to violate 33 U.S.C. § 1908(a) and to commit obstruction of justice. *See* Doc. 41.  Here, Counts Two and Three of the Indictment are fatally deficient ***and*** do not properly charge a violation of law (so they will be addressed first), and as such, there simply exists no factual basis to support the charge of Conspiracy in Count One.

Kaye, Rose & Partners LLP

Cir. 1986) (*per curiam*); *United States v. Bergrin*, 650 F.3d 257, 264 (3d Cir. 2011); *see also United States v. Boffa*, 513 F. Supp. 444, 467 (D. Del. Dec. 12, 1980) ("[The] Court's task is not to determine whether the Indictment could have been more artfully or exactly written, but solely to insure that the constitutional notice requirements imposed by the Fifth and Sixth Amendments have been fulfilled"). In other words, because "[t]he sufficiency of a criminal indictment is determined from its face," *United States v. Salman*, 378 F.3d 1266, 1268 (11th Cir. 2004), a motion to dismiss is appropriate for testing whether the facts, as alleged, would constitute a crime. *See, e.g., United States v. Kaluz*a, 780 F.3d 647, 664 (5th Cir. 2015) (affirming the dismissal of certain counts of the indictment because the "Defendants do not fall within the meaning of the statute"); *see also United States v. Carlisle*, 693 F.2d 322, 324 (4th Cir. 1982) (per curiam) (holding that the indictment should have been dismissed because "check-kiting is not an offense within the terms of [18 U.S.C.] § 1014")

Count Two charges that it is a crime to "knowingly fail[] to fully and accurately record, and willfully cause[] others to fail to fully and accurately record, in the AMAZON's Oil record Book . . . and cause[] that inaccurate Oil Record Book to be presented to the United States Coast Guard in the Port of Los Angeles on or about January 11, 2019." Doc. 41, p. 16. (citing 33 U.S.C. § 1908(a) and 33 C.F.R. 151.25 (a), (d), and (h)).  Significantly, all relevant engine room operations and record keeping obligations, as the government well knows, occurred on the high seas -- not within the navigable waters of the United States.  No U.S. law or regulation requires a foreign vessel to maintain an Oil Record Book at any time other than while it is in the navigable waters of the United States (or at a port or terminal of the United States).  *See* 33 C.F.R. § 151.09.  In addition, <u>no</u> U.S. law requires a knowingly <u>*accurate*</u> Oil Record Book ("ORB") of a foreign-flagged vessel, only that the ORB be maintained by the Master (or other person in charge of the Vessel) while in U.S. waters. *Id*., *see also* 33 C.F.R. § 151.25(j); 33 U.S.C. § 1908(a).    Accordingly, Count Two fails to charge "an offense against the laws of the United States."  *See* 18 U.S.C. § 3231.  The sections of MARPOL, APPS, and the regulations cited above make clear that a port state has jurisdiction over only those violations which occur "***within the jurisdiction of [the Port State]***."  *See* MARPOL 73/78,

Kaye, Rose & Partners LLP

Art. 4(1), 12 I.M.L. at 1322; APPS 33 U.S.C. § 1902; 33 C.F.R. 151.09; *see also United States v Abrogar*, 459 F.3d 430 (3d Cir. 2006).

### 1.     *Abrogar* Confirms That There is No U.S. Offense or Jurisdiction

The government's prosecution of MARPOL/APPS cases is premised on the misguided belief that the word "maintain" as it is used in the regulation, is intended to confer on the government the purported authority to enforce MARPOL on a world-wide basis, or at least against any foreign-flagged vessel and crew that happen to enter any U.S. port.   This interpretation of MARPOL is wrong.   The Third Circuit's decision in *United States v. Abrogar* is instructive.   *Id.*

> A MARPOL violation by [a foreign] vessel or its personnel is only an 'offense' under U.S. law if that violation occurs within the boundaries of U.S. waters or within a U.S. port.. . .The United States [thus] has no jurisdiction to prosecute a foreign vessel or its personnel for 'failure to maintain an accurate oil record book' outside of U.S. waters. . . Stated differently, the terms of the Act and its regulations exclude from criminal liability the 'failure to maintain an accurate oil record book' by foreign vessels outside U.S. waters.

*Abrogar*, 459 F.3d at 435.

In *Abrogar*, the vessel's Chief Engineer voluntarily agreed to plead guilty to the charge of "failing to maintain an accurate oil record book as required by 33 C.F.R. §151.25, in violation of 33 U.S.C. §1908(a)."   *Id.* at 433.   The only issue on appeal was whether pollution events occurring on the high seas were relevant conduct that could be taken into account in fashioning Abrogar's sentence.   *Id.* at 431.   The United States Court of Appeals for the Third Circuit concluded that the acts conducted on the high seas *was not conduct* which could be considered under the sentencing guidelines, and the Third Circuit vacated Abrogar's sentence and remanded the case for resentencing.   *Id.* at 437.

As Abrogar had pled guilty, the Third Circuit Court of Appeals was not called upon to determine whether the alleged failure to "maintain an accurate" Oil Record Book is a crime at all – especially if the events inaccurately or insufficiently recorded, occurred _only_ outside the United States.   Notwithstanding, *Abrogar* provides critical guideposts for this Court's review of the alleged offense in this matter.   If the actions of the Chief Engineer in *Abrogar* was not

Kaye, Rose & Partners LLP

conduct which could be reviewed for the purposes of imposing a sentence under the admittedly more relaxed standard of 'relevant conduct'[13] used for sentencing, it certainly cannot be the basis for a criminal violation in this case. Significantly, though, the Third Circuit Court of Appeals explained that: "APPS provisions and regulations cited above do not merely implicate jurisdiction. They are worded in such a way as to define, for purposes of U.S. law, *the scope within which MARPOL violations constitute crimes at all, irrespective of implications for jurisdiction proper.*" *Abrogar*, 459 F.3d at 435 n. 3.

Defendants respectfully submit, that mere possession of an alleged inaccurate or incomplete ORB within the United States (or the failure to maintain an accurate ORB) is not a crime against the United State for the following reasons:

1. No form of the word "accurate" or "accurately" appears in the APPS statute or the MARPOL treaty from which it was taken;

2. Section 151.09 of the Code of Federal Regulations makes clear that the United States requires entries in a foreign ship's ORB only "while in the navigable waters of the United States" or at a "port or terminal of the United States." 33 C.F.R. §151.09  It would make no sense to specify that entries are required only for events that occur in our country and yet prosecute foreigners for failing to make an entry for an event that occurred thousands of miles away and months before arrival; yet the government is bringing just such a charge against these Defendants.

3. Although the Coast Guard regulations implementing APPS employ the word "maintain", the word is most commonly understood to mean "to keep or preserve." The government's theory, on the other hand, is that although the U.S. law requires no entries (accurate or otherwise) in the ORB at the time of high seas events, section 151.25 is intended to require a ship's captain, upon entering the United States, to go back and add or correct entries for events occurring outside the United States.  Such is an uncommon interpretation of the word "maintain" and one at odds with the regulations' use of the word.  The regulations expressly provide that a Master (i.e. – the Captain) is responsible for the maintenance of the book only "while in the navigable waters of the United States."  33 C.F.R. §

---

[13] "Relevant conduct" is "the range of conduct that is relevant to determining the applicable offense level" under the Guidelines Manual.  *See* § 1B1.3 comment. (backg'd.). Section 1B1.3 of the Guidelines Manual defines relevant conduct and explains the rules for determining what acts or omissions are considered relevant conduct to a given offense type.  Specifically, in every case, relevant conduct includes "actions of the defendant performed *in preparation for the offense, during the offense, and following the offense to avoid detection*." Section 1B1.3(a)(1)(emphasis added).

DEFENDANTS' MOTION TO DISMISS COUNTS ONE, TWO,
THREE, AND FIVE OF THE INDICTMENT

151.25(j) and 33 C.F.R. 151.09(a); *see also United States v. Fafalios*, 817 F.3d 155, 159 (5th Cir. 2016) (citing *Thompson v. Goetzmann*, 337 F.3d 489, 499 (5th Cir. 2003) (invoking the "well-known interpretative canon, *expressio unius est exclusio alterius*—'the expression of one thing implies the exclusion of another")). Moreover, while the Master is "responsible for the maintenance" of the book in this country, there is no express or implied requirement that he determine the accuracy of individual entries, even entries made in this country. *Id.* The individuals completing the operations (in this country) are required to make entries. 33 C.F.R.§ 151.25(h). The Master's job (while in this country), in addition to being responsible for the "maintenance of the" ORB, is merely to "sign" "each completed page." 33 C.F.R. § 151.25(j).

4.  Although the APPS regulations employ the word "maintain," the MARPOL regulations themselves do not employ the term. Instead, those regulations state that the vessel "shall be provided with" (rather than "maintain") an ORB and that the ORB shall be "kept" in an accessible place. MARPOL Reg. 17, *supra*.

5.  Read as a whole, MARPOL and APPS make clear they require international cooperation and port-state enforcement of high seas violations – not a system whereby any port state can take over worldwide enforcement by the mere expediency of claiming foreigners' records concerning foreign events are inaccurate.

In addition, the government's bizarre interpretation of MARPOL, APPS and the implementing regulations violates the rule of lenity. *See, e.g., Yates v. United States*, 135 S. Ct. 1074, 1079-80 (2015)(applying rule of lenity to conclude that fish are not a "tangible object" within the meaning of 18 U.S.C. §1519, prohibiting obstruction of justice by "destroying" tangible objects with the intent to impede an investigation); *United States v. Diaz*, 592 F.3d 467, 474 (3d Cir. 2010)(applying rule of lenity in construing firearm enhancement and application of consecutive sentence provision regarding multiple violations of 18 U.S.C. §924(c)).

The government's interpretation further violates the "presumption against extraterritoriality" by which "absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2100 (2016). Far from "clearly expressing" an intent that the United States should seek to enforce MARPOL on a worldwide basis, Congress made clear in APPS that violations of MARPOL, APPS and the regulations under APPS are

DEFENDANTS' MOTION TO DISMISS COUNTS ONE, TWO,
THREE, AND FIVE OF THE INDICTMENT

Kaye, Rose & Partners LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Kaye, Rose & Partners LLP

criminalized only if they occur in the United States.  Thereafter, the Coast Guard changed the words of "shall be provided an oil record book" as specified in MARPOL Regulation 17 to the words "shall maintain an oil record book" in the Code of Federal Regulations – and added a provision that the Master "shall be responsible for the maintenance" of the ORB.  But the regulations repeated that those (and all) provisions apply to foreign ships only "while in the navigable waters of the United States."  So, fairly read, they do not suggest an inaccurate or incomplete entry made on the high seas by a foreigner in a foreign vessel's ORB becomes a crime against the United States whenever the vessel enters U.S. water.  In the charging documents – but not in any law or regulation – the government then added the word "accurate" in the middle of the phrase "maintain an ORB" in an effort to assert jurisdiction over events suspected of occurring on the high seas.  This is not the "clear" expression of "*congressional intent*" required to exercise U.S. criminal jurisdiction over foreigners for foreign events.  The provisions of MARPOL and APPS discussed at length herein make clear the treaty and statute were not intended to – and do not – allow for this assertion of criminal jurisdiction over foreign nationals for suspected high seas events.

### 2.   Cases Regularly Cited by the Government are Inapposite

It is anticipated that the government will rely on, *inter alia*, the United States Court of Appeals for the Second Circuit decision in *United States v. Ionia Mgmt. S.A.*, 555 F.3d 303 (2d Cir. 2009) and the United States Court of Appeals for the Fifth Circuit decision in *United States v Jho*, 534 F.3d 398 (5th Cir. 2008), for the proposition that Count One in the Indictment for the 'knowing failure to maintain an accurate Oil Record Book while in United States waters' under 33 U.S.C. § 1908(a) has been resolved by two (2) Circuit Courts in favor of the government's right to prosecute alleged violations of MARPOL/APPS, even when occurring in international waters.  *See e.g. Jho*, 534 F.3d at 401-02 ("[W]e read the requirement that an oil record book be "maintained" as imposing a duty upon a foreign-flagged vessel to ensure that its oil record book is accurate (or at least not knowingly inaccurate) upon entering the ports of navigable waters of the United States."); *Ionia Mgmt. S.A.*, *supra*

16

(adopting same).[14]

Both of these cases improperly read into the statute and regulations an obligation (*i.e.* that the ORB be "knowingly accurate" or at least not "knowingly inaccurate") which does not exist. Both of those cases were also decided <u>before</u> *United States v. Fafalios* and under a (mis)belief that a Chief Engineer could be principally charged and convicted for the failure to maintain an Oil Record Book. *See, e.g. Jho*, 534 F.3d at 404. The Fifth Circuit Court of Appeals made clear in the *Fafalios* that the legal obligation falls squarely (and exclusively) on the Master or other person in charge of the vessel. *See United States v. Fafalios*, 817 F.3d at 159. A Chief Engineer is neither. The United States Court of Appeals for the Third Circuit made clear in *Abrogar* that APPS and the accompanying regulations were limited in scope and applicability to only offenses which occurred within the jurisdiction of the United States, and not in international waters. The limits of APPS and the accompanying regulations were explained by the Third Circuit, as follows:

> . . . the United States has ***no jurisdiction*** to prosecute a foreign vessel or its personnel for "failure to maintain an accurate oil record book" outside of U.S. waters. Furthermore, ***no provision of the APPS or its accompanying regulations indicates that "failure to maintain an accurate oil record book" by a foreign ship outside U.S. waters is a crime***. Stated differently, the terms of the Act and its regulations exclude from criminal liability the "failure to maintain an accurate oil record book" by foreign vessels outside U.S. waters.

*United States v. Abrogar*, 459 F.3d 430, 435 (emphasis added).

The Third Circuit was adamant that these legal distinctions were of particular significance. As highlighted by the Third Circuit, "The APPS provisions and regulations cited

---

[14] The Second and Fifth Circuits were not asked and/or did not consider the limitations of MARPOL and APPS when they held that 33 C.F.R. § 151.25(a) imposes an ongoing "duty upon a foreign-flagged vessel to ensure that its oil record book is accurate (or at least not knowingly inaccurate) upon entering the ports of navigable waters of the United States." *Jho*, 534 F.3d at 403; *accord Ionia Mgmt.*, 555 F.3d at 308 (quoting the same). Instead, they reasoned that such an interpretation is necessary to preserve "the government's ability to enforce MARPOL's requirements." *Jho*, 534 F.3d at 403; *see also Ionia Mgmt.*, 555 F.3d at 308 (similar). But this understanding gets the obligation backwards. If "a ship of another commits a violation which [the United States] know[s] about on the high seas and enters our jurisdiction, [the United States] . . . cannot prosecute that vessel for the violation outside of our jurisdiction." Hearing on 1973 Convention, *supra*, at 7 (emphasis added); *see also* 33 U.S.C. § 1902(a)(2), (3).

Kaye, Rose & Partners LLP

above do not merely implicate jurisdiction. They are worded in such a way as to define, for purposes of U.S. law, the scope within which MARPOL violations *constitute crimes at all*, irrespective of implications for jurisdiction proper." *Id.* at 435 n. 3. (emphasis added). To find otherwise would violate the presumption against continuing offenses, the presumption against the extraterritorial application of law, and the rule of lenity. There is no indication that the Second and Fifth Circuits even considered these established canons of interpretation. *See United States v Jho*, 534 F.3d 398, 403-04 (5th Cir. 2008); *see also United States v. Ionia Mgmt. S.A.*, 555 F.3d 303, 307-09 (2d Cir. 2009).

Justice Marshall in *Boston & Me. R.R.* explained the historic roots of the limits on criminal prosecution, stating that "the fact that a particular activity may be within the same general classification and policy of those covered does not necessarily bring it within the ambit of the criminal prohibition." *United States v. Boston & Me. R.R.*, 380 U.S. 157, 160, 13 L. Ed. 2d 728, 85 S. Ct. 868 (1965) ("The rule that penal laws are to be construed strictly, is, perhaps, not much less old than construction itself. *It is founded on the tenderness of the law for the rights of individuals*; and on the plain principal that the power of punishment is vested in the legislative, not in the judicial department.")(emphasis added).  Said another way, where as here, the statute and regulations do not constitute a violation of U.S. law, the government and Court may not substitute in missing qualifiers not imposed by Congress.  Accordingly, Count Two must be dismissed as a matter of law as there has been no offense against the United States because the Defendants did not, and could not, knowingly fail and/or cause the failure to maintain an accurate Oil Record Book for the M/V CMA CGM AMAZON while in U.S. waters.

### C.  COUNT THREE OF THE INDICTMENT MUST BE DISMISSED.

Count Three of the Indictment charges Obstruction of Justice for the Defendants' intent to "impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of the United States Coast Guard, . . . [by] knowingly fail[ing] to fully and accurately record and maintain and concealed and covered up, . . . required entries in the AMAZON's Oil Record Book. . ." DE 41, p. 17.

18

Kaye, Rose & Partners LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Kaye, Rose & Partners LLP

The conduct alleged in Count Three is for an action that occurred "at sea" and/or during "at-sea operations." *A foriori*, these alleged offenses did not occur within the jurisdiction of the United States. As explained above, there is a longstanding presumption that, when Congress legislates, the law applies "only within the territorial jurisdiction of the United States." *E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991); *accord Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255, 130 S. Ct. 2869, 2877, 177 L. Ed. 2d 535 (2010). To overcome this presumption, Congress must "*clearly express[]*" an "affirmative intention" to the contrary. *Arabian Am. Oil*, 499 U.S. at 248 (emphasis added). This is particularly true with respect to a criminal statute. *Cf. Arthur Andersen LLP v. United States*, 544 U.S. 696, 703, 125 S. Ct. 2129, 161 L. Ed. 2d 1008 (2005) ("We have traditionally exercised restraint in assessing the reach of a federal criminal statute . . . .").

The relevant obstruction statute at issue in Count Three —18 U.S.C. § 1519— does not contain such a clear expression of extraterritorial application. There is no hint, let alone an affirmative expression, in the text or legislative history that Congress intended this statute to reach conduct committed by foreign citizens outside the territorial jurisdiction of the United States.  The U.S. Supreme Court's decision in *United States v. Bowman*, 260 U.S. 94, 98 (1922), established a limited exception to the presumption against extraterritorial application where Congress's intent could be *inferred* from the circumstances, including from the nature of the offense. *United States v. Plummer*, 221 F.3d 1298, 1304 (11th Cir. 2000) ("*Bowman* established the rule that Congress need not expressly provide for the extraterritorial application of a criminal statute if the nature of the offense is such that it may be inferred."). *Bowman* does not compel a different result here. In *Bowman*, the Court explained that the extraterritorial application of some statutes—directed at preventing "obstruction, or fraud"—can "be inferred from the nature of the offense." *Bowman*, 260 U.S. at 98. It then listed examples where such statutes were directed at events that would necessarily occur abroad or on the high seas, such as a statute penalizing a "consul [who] knowingly certifies a false invoice" or a statute specifically directed at "[f]orging or altering ship's papers." *Id.* at 99.

The U.S. Supreme Court acknowledged that the crime before it—knowingly presenting

19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Kaye, Rose & Partners LLP

a false claim to a "corporation in which the United States is a stockholder"—was missing these hallmarks. *Id.* at 101. But the Court inferred an extraterritorial intent because, when Congress amended the general fraud statute to include a fraud committed against "a corporation in which the United States owns stock," it "intended to protect the Emergency Fleet Corporation," a federally-held company that "was expected to engage in, and did engage in, a most extensive ocean transportation business, and its ships were seen in every great port of the world." *Id.* at 101-02. Thus, the Court found evidence of a ***specific intent*** to apply the general fraud statute at issue there to extraterritorial conduct. *See id.*  As set forth below, there is no such inferred intent in the statutes relied upon by the government in support the remaining counts in the Indictment.

The same specific intent is missing with respect to the obstruction statute charged in Count Three.  Indeed, when Congress intends for a general obstruction statute to have extraterritorial application, it makes that intent clear. For example, 18 U.S.C. §§ 1512 and 1513 contain affirmative extraterritoriality provisions. 18 U.S.C. § 1512(h) ("There is extraterritorial Federal jurisdiction over an offense under this section."); *id.* § 1513(d) (same). These provisions were added to the criminal code in 1982, *see* Victim and Witness Protection Act of 1982, Pub. L. No. 97-291, § 4(a), 96 Stat 1248, 1250, and yet, Congress did not see fit to amend 18 U.S.C. § 1505 to include a similar provision, nor did it do so when it added 18 U.S.C. § 1519 to the criminal code in 2002, *see* Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, tit. VIII, § 802(a), 116 Stat. 745, 800.

In short, Congress plainly expressed its intent that only certain obstruction statutes were meant to have extraterritorial effect; but not 18 U.S.C. §§ 1505 and 1519.  Accordingly, these statutes do not have extraterritorial effect. *See Carnero v. Boston Scientific Corp.*, 433 F.3d 1, 8 (1st Cir. 2006) (holding that 18 U.S.C. § 1519 does not apply extraterritorially because "Congress has provided expressly elsewhere in the Sarbanes-Oxley Act for extraterritorial enforcement of a different, criminal, whistleblower statute"); *see also United States v. Gabriel*, 920 F. Supp. 498, 501 (S.D.N.Y. Mar. 27, 1996) (Rakoff, J.) (noting that Congress had expressly provided for extraterritorial application of 18 U.S.C. § 1512, in

20

contrast to other obstruction statutes).

For example, the charge brought under Section 1519 in Count Three alleges that the Defendants impeded and/or obstructed the Coast Guard's inspection of the M/V CMA CGM AMAZON because the Oil Record Book failed to contain required entries "including disposals and overboard discharges of oily water from the engine room bilge wells, machinery spaces, and Clean Drain Tank." DE 41, p. 17. Count Three must be dismissed in its entirety for the failure to state a U.S. crime. Under the plain language of the relevant regulations, the alleged events and documents concerning the events are beyond U.S. jurisdiction and implicate only Liberian law. *United States v. Abrogar*, 459 F.3d 430, 435 (3d Cir. 2006). The United States may not, by the practice of developing and operating the law enforcement scheme outlined above, create worldwide jurisdiction over events by which foreigners violate (or comply with) only foreign law.

### D. COUNT ONE MUST BE DISMISSED

A conspiracy is "a combination of two or more persons, by concerted action, to accomplish a criminal or unlawful purpose, or some purpose not in itself criminal or unlawful, by criminal or unlawful means." *Pettibone v. United States*, 148 U.S. 197, 203, 13 S.Ct. 542, 545, 37 L.Ed. 419 (1893). "The essence of any conspiracy is the agreement or confederation to commit a crime." *United States v. Bedford*, 536 F.3d 1148, 1155 (10th Cir. 2008) (internal quotation marks and citation omitted), *cert. denied*, 129 S. Ct. 1359, 173 L. Ed. 2d 620 (2009). The charge under 18 U.S.C. § 371 fails as a matter of law, as there was no underlying offense against the United States for the alleged conduct on the high seas, *i.e.* "to fail, and to willfully cause the failure, to maintain an accurate oil record book, in violation of 33 U.S.C. § 1908(a)." Doc. 41, p. 8. In addition, as set forth above, since there was no violation of U.S. law for the "failure to maintain an accurate Oil Record Book", *Abrogar, supra*; then it could not be an object of the conspiracy to "defraud the United States" and "the lawful and legitimate functions of the United States Coast guard in investigating and enforcing federal laws and

Kaye, Rose & Partners LLP

regulations related to Port State Control Inspections and the discharge of oil from a ship." *Id*.

APPS and its implementing regulations only govern discharges which occur within the navigable waters of the United States.  The duty to maintain an Oil Record Book is prescribed exclusively to the Master while in the navigable waters of the United States (or at a port or terminal thereof).  *See* 33 C.F.R. § 151.25(j) and 33 C.F.R. 151.09(a)(5).  Consequently, there was no underling violation of U.S. law in this matter and as such, these actions cannot serve as the basis of the "objects of the conspiracy" pursuant to 18 U.S.C. § 371.

### E. COUNT FIVE FAILS TO CHARGE AN OFFENSE AND MUST BE DISMISSED

A violation of section 1503 requires a showing that the defendants had knowledge that a federal proceeding was pending. *United States v. Washington Water Power Co.*, 793 F.2d 1079, 1084 (9th Cir. 1986) (citing *United States v. Baker*, 494 F.2d 1262, 1265 (6th Cir. 1974)). There was no federal proceeding pending as of January 11, 2019, were no proceedings pending until at least May 2019. *See, e.g*., Criminal Complaint issued May 15, 2019 (Doc. 1); Indictment issued June 13, 2019 (Doc. 41).  Accordingly, Count Five of the Indictment must be dismissed in its entirety as it fails to charge the essential element(s) of a violation of 18 U.S.C. 1503.   The statute provides:

> Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, magistrate judge, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b). If the offense under this section occurs in connection with a trial of a criminal case, and the act in violation of this section involves the threat of physical force or physical force, the maximum term of imprisonment which may be imposed for the offense shall be the higher of that otherwise provided by law or the maximum term that could have been imposed for

*(left margin, vertical text)* Kaye, Rose & Partners LLP

1   any offense charged in such case.

2   *Id.*

3   Count Five of the Indictment charges Defendants as follows:

4
5   On or about January 11, 2019, in Los Angeles County, within the Central District
    of California, defendants Luca and Capital, acting through the conduct of its
    employee, defendant LUCA, knowingly and with the intent to obstruct justice,
6   corruptly endeavored to influence, obstruct, and impede the due administration of
    justice.   Specifically, defendant Luca, acting as the Chief Engineer of the
7   AMAZON, directed Oilers 2 and 3 to falsely report to the United States Coast
    Guard that they had extracted only 200 to 300 liters of leaked fuel oil from the
8   duct keel of the AMAZON in cleaning up a fuel leak, when in fact, as defendant
    Luca then knew, the amount of leaked fuel oil at issue was substantially greater
9   than that amount.

10

11  *See* Doc. 41, pp. 19-20.

12  On its face, the Indictment fails to charge any of the following elements of the crime of

13  obstruction of justice pursuant to 18 U.S.C. 1503 as:

14  1. There is no allegation that the conduct in Count Five was done "by threats or force,

15  or by any threatening letter or communication."

16  2. There is no allegation that the conduct was done to influence, intimidate, or impede,

17  "a grand or petit juror";

18  3.  There is no allegation that the conduct was done to influence, intimidate, or impede,

19  an "officer in or of any court of the United States."

20  4. There is no allegation that the conduct was done to influence, intimidate, or impede,

21  an "officer who may be serving at any examination or other proceeding before any United

22  States magistrate judge or other committing magistrate."

23  5. There is no allegation of injury to "any such grand or petit juror in his person or

24  property on account of any verdict or indictment assented to by him, or on account of his being

25  or having been such juror, or injures any such officer, magistrate judge, or other committing

26  magistrate in his person or property on account of the performance of his official duties."

27  *Cf.*, Doc. 41, pp. 19-20 and 18 U.S.C. § 1503.

28  //

Kaye, Rose & Partners LLP

23

1
2
3
4

Count Five relies exclusively on the following language from 18 U.S.C. § 1503, [Defendants] "corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice . . ." *Id*. However, as the Ninth Circuit has long held,

5
6
7
8
9

> "The statute in question is designed to achieve the twin goals of protecting the participants in a specific proceeding and of preventing a miscarriage of justice in a case pending in a federal court. *Catrino v. United States*, 176 F.2d 884, 887 (9th Cir. 1949). For this reason, it is well settled that the statute is not applicable until, at the earliest, a complaint has been filed with a United States Commissioner. *E.g.*, *United States v. Perlstein*, 126 F.2d 789 (3d Cir.), cert. denied, 316 U.S. 678, 62 S. Ct. 1106, 86 L. Ed. 1752 (1942).

10
11
12
13

*United States v. Metcalf*, 435 F.2d 754, 756 (9th Cir. 1970); approved and explained in *United States v. Washington Water Power Co.*, 793 F.2d 1079, 1084 (9th Cir. 1986) ("We have previously held that a federal proceeding is 'pending' for purposes of section 1503 as soon as a complaint has been filed with a magistrate.").

14
15
16
17
18
19
20
21
22
23

Courts have repeatedly rejected attempts by the government to apply § 1503, more broadly, as the statute must be strictly construed under the doctrine of *ejusdem generis*, "the general words which follow the specific words in the enumeration of prohibited acts in the section here involved must be construed to embrace only acts similar in nature to those acts enumerated by the preceding specific words." *Haili v. United States*, 260 F.2d 744,746 (9th Cir. 1958); *see also United States v. Brown*, 688 F.2d 596, 598 (9th Cir. 1982)(interference with "'the due administration of justice' cannot be construed to proscribe conduct which takes place wholly outside the context of an ongoing judicial or quasi-judicial proceeding[]" and finding that "***No case*** interpreting § 1503 has extended it to conduct which was not aimed at interfering with a pending judicial proceeding")(emphasis added).

24
25
26
27
28

Courts have repeatedly held that "an investigation simpliciter is not enough to trigger § 1503. For example, intentionally interfering with the execution of a search warrant by warning its target to conceal or dispose of evidence does not involve a pending judicial proceeding and therefore falls outside of § 1503." *United States v. Davis*, 183 F.3d 231, 239 (3d Cir. 1999) (citing *Brown*, *supra*); *United States v. Simmons*, 591 F.2d 206, 208 (3d Cir.

Kaye, Rose & Partners LLP

24

1979)("The obstruction of an investigation that is being conducted by the FBI, or by any similar governmental agency or instrumentality, does not constitute a § 1503 violation because such agencies or instrumentalities are not judicial arms of the government 'administering justice.'").  *United States v. Holloway*, No. CR-F-08 -224-OWW, 2009 U.S. Dist. LEXIS 108387, at *18 (E.D. Ca. Nov. 20, 2009) (quoting *United States v. Aguilar*, 21 F.3d 1475 (9th Cir.1994), *aff'd in part and rev'd in part*, 515 U.S. 593, 115 S. Ct. 2357, 132 L. Ed. 2d 520 (1995)("The fact that the FBI investigation could result in producing evidence that might be presented to a grand jury is insufficient to constitute a violation of section 1503.").

Count Five of the Indictment fails to charge an offense under 18 U.S.C. §1503 and must be dismissed in its entirety as a matter of law.

### F. DUE PROCESS WARRANTS DISMISSAL

Where, as here, there has been no U.S. offense committed in Counts One, Two, Three, and/or Five and the implementing regulations for same, traditional notions of due process preclude prosecution in this case. It is unconstitutional to prosecute a defendant for conduct when there is no notice that the conduct is subject to criminal sanctions.  *See United States v. Lanier*, 520 U.S. 259, 264-65, 117 S.Ct. 1219, 1224-25, 137 L. Ed. 2d 432 (1997).  It has long been settled that penal statutes are to be construed strictly, and that one is not to be subjected to a penalty unless the words of the statute plainly impose it. *United States v. Campos-Serrano*, 404 U.S. 293, 297, 92 S. Ct. 471, 30 L. Ed. 457 (1971).  *United States v. Hussein*, 351 F.3d 9, 14 (1st Cir. 2003); *see also United States v. Nason*, 269 F.3d 10, 22 (1st Cir. 2001). "The Supreme Court has also held that 'due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope. [T]he touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *DeGennaro v. Maine*, No. 2:15-cv-00381-GZS, 2016 U.S. Dist. LEXIS 58445, at *11 (D. Me. May 3, 2016) (*citing Lanier*, *supra*).  This Court should not countenance the government's overbroad misinterpretation of APPS and the accompanying regulations and Counts One through Three and Five should be dismissed as a

Kaye, Rose & Partners LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kaye, Rose & Partners LLP

matter of due process.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, Defendants respectfully request that this Court dismiss Counts One, Two, Three, and Five the Indictment against Defendants Ioan Luca and Capital Ship Management Corp. in their entirety and grant such other relief that this Court deems just and proper.

Dated: August 12, 2019            **KAYE, ROSE & PARTNERS, LLP**

By:  /s/ Bradley M. Rose
                                         Bradley M. Rose (126281)
                                         *Attorney for Capital Ship Management*
                                         *Corp.*

Dated: August 12, 2019            **CHALOS & CO, P.C.**

By:  /s/ Briton P. Sparkman
                                         George M. Chalos, PHV
                                         Briton P. Sparkman, PHV
                                         *Attorney for Capital Ship Management*
                                         *Corp.*

Dated: August 12, 2019            **TUCKER ELLIS LLP**

By:  /s/ Marc R. Greenberg
                                         Marc R. Greenberg (123115)
                                         *Attorney for Ioan Luca*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Kaye, Rose & Partners LLP

## **CERTIFICATE OF SERVICE**

I hereby certify that the Notice of Motion and Motion of Defendant Capital Ship Management Corp. and Ioan Luca to Dismiss Counts One, Two, Three, and Five of the Indictment were filed through the Court's CM/ECF system which will generate a Notice of Electronic Filing ("NEF") automatically and e-mail of the filing to all attorneys of record for parties who have appeared in the case who are registered CM/ECF users.

/s/ Briton P. Sparkman
Briton P. Sparkman